UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BUTHAYNA HAMMAD, § | | |
| *Plaintiff*, § | | Civil Action No.: |
| v. § | | |
| § | | 4:14-cv-01938 |
| DYNAMO STADIUM LLC, NATHAN § | | |
| BUCHANAN, and JOHN DOE  HOUSTON § | | |
| POLICE OFFICERS, in their individual capacities, § | | JURY DEMANDED |
| *Defendants*. § | | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff Buthayna Hammad respectfully asks the Court to deny Defendant Dynamo Stadium's and Defendant Nathan Buchanan's Motion to Dismiss because her First Amended Complaint states valid causes of action against all Defendants. The Defendants acted under color of law due to the City's pervasive entwinement with management of speech at the Stadium, discriminated on the basis of Ms. Hammad's status as a Palestinian American, and falsely imprisoned her by unlawfully restricting her movement, albeit temporarily.

I.   FACTUAL & PROCEDURAL OVERVIEW

The First Amended Complaint, filed September 17, 2014, alleges that Defendants removed Ms. Hammad from the BBVA Compass Stadium (Stadium) during a soccer match between Honduras and Israel. Ms. Hammad, an American citizen of Palestinian descent, had been waving a Palestinian flag—just as many other attendees waved their own national flags. Defendants told Ms. Hammad that her waving a Palestinian flag implied a "racial slur," and they removed her from, and detained her outside, the arena. After holding Ms. Hammad until roughly halfway through the game, Defendants released her, but prohibited her from waving the flag.

Ms. Hammad brings claims under 42 U.S.C. §§1981, 1983, 1985, and 2000a (Title II), alleging race, ethnicity, or national origin discrimination, First and Fourth Amendment violations, and segregation. She also alleges Defendants committed the Texas common law tort of false imprisonment.

Defendants Dynamo and Nathan Buchanan now bring a Motion to Dismiss Plaintiff's First Amended Complaint. They argue that, as non-governmental entities, they are not liable under the civil rights statutes and that Ms. Hammad has failed to allege facts that would entitle her to relief.

## II. SUMMARY OF THE ARGUMENT

Counts I and II, the §1983 and §1985 claims, are adequately supported by facts showing that Defendants acted under color of law and violated Ms. Hammad's rights. Dynamo acted under color of law because its management of the Stadium is pervasively entwined with the City of Houston and because the Stadium is a public forum, making its management a public function.

In addition, Dynamo and Mr. Buchanan acted jointly with uniformed police officers in detaining Ms. Hammad based on her race, ethnicity, or national origin, thereby independently satisfying the "under color of law" requirement.

As to Count II, the §1985 claim, Dynamo's agent and representative, Mr. Buchanan, directly engaged in misconduct while supervising the Defendant police officers, making the Defendants' involvement in the conspiracy obvious.

Ms. Hammad also sufficiently pleaded Title II and §1981 violations, Counts III and IV. Ms. Hammad's status as a Palestinian American and association with Palestine establish that she is a member of a "protected class" by virtue of her race, ethnicity, or national origin. Further, Mr. Buchanan's accusation that her waving a Palestinian flag amounted to a "racial slur" is more than enough to show that Defendants temporarily removed her from the Stadium *on account of* her Palestinian descent. Defendants pulled her out of the Stadium and refused to let her back in unless she agreed to stop waving the Palestinian flag—and thus prevented her from enjoying the full benefit of the services provided to other patrons.

As to Ms. Hammad's false imprisonment claim, Count V, Defendants' Motion uses an incorrect definition of a "detention" within the meaning of Texas common law: False imprisonment

requires only that Ms. Hammad have been unlawfully prevented "from moving from one place to another." *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644-45 (Tex. 1995). Defendants physically blocked her from returning to her seat without lawful justification, thereby falsely imprisoning her.

III. ARGUMENT

    A. <u>Ms. Hammad alleges facts showing that Defendants' acted under color of law.</u>

Dynamo and Mr. Buchanan acted under color of law, despite their private status, because: (1) Dynamo has a close, interdependent relationship with the City as to their agreement, which governs Dynamo's speech regulation in the Stadium, and their shared financial interest in the Stadium; (2) the Stadium remains a designated or traditional public forum, so Dynamo's and Buchanan's management of speech in the forum amounts to state action; and (3) Mr. Buchanan, and thereby Dynamo, acted jointly with Defendant police officers in detaining Ms. Hammad.

A private entity acts "under color of law" within the meaning of 42 U.S.C. §1983 if "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (internal quotes removed). Among the various tests for "fairly treat[ing]" a private entity as engaged in state action are the "entwinement," "public function," and "joint action" tests. *See, e.g.*, *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 627–28 (1991); *Evans v. Newton,* 382 U.S. 296, 299 (1966). The First Amended Complaint satisfies all three tests.

    **1. Dynamo's regulation of speech in the Stadium, as enforced by exclusion, came under color of law due to pervasive entwinement with the City.**

Pervasive entwinement satisfies the "close nexus" standard if "[c]onduct that is formally 'private' . . . become[s] so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state

action." *Evans v. Newton*, 382 U.S. 296, 299 (1966). Dynamo has a close nexus with the City when it opens the Stadium to the public for events, especially when it regulates speech during these events.

Dynamo gains many benefits from its close nexus with the City: the Stadium is built on City-owned land[1] and Dynamo pays only nominal rent to operate the Stadium; the City rebates property taxes and waives sales taxes on Stadium improvements; the City exempts Dynamo from ordinances and regulations which are inconsistent with the contract; and the City agrees not to allow exhibition of Professional Soccer in any other stadium it owns or controls.[2]

In return, Dynamo is bound to host Houston Dynamo games and to allow the City up to nine days of control per year for events including "public … forums," given proper notice; the City retains a strong financial interest, as Dynamo still pays local taxes on ticket and concessions sales.[3] Finally, the City prohibits Dynamo from allowing certain activities at the Stadium.

Most telling is the City's prohibition on the display of "any lewd, offensive, or immoral sign."[4] Defendants dispute whether "Dynamo is contractually obligated by the City to regulate the content of speech in the Stadium," arguing from its interpretation of the lease that only the City can enforce this prohibition, so, Defendants argue, somehow Dynamo is not actually bound by the provision.[5] Even assuming Defendants' reference to and interpretation of the enforcement provision is correct, Defendants' argument is—at best—a confusion of grammar. Even under Defendants' interpretation, Dynamo is bound by the prohibition because *the City* can enforce it against Dynamo; in turn, Dynamo is expected to and, in fact, does restrict the speech of Stadium patrons.

---

[1] The Stadium also has Houston Community College, an arm of the Houston Independent School District, as

[2] *See* Dkt. 12 at p. 6, paras. 22-24.

[3] *See* Dkt. 12 at p. 6, paras. 24, 22.

[4] *See* Dkt. 12 at p. 6, para. 23.

[5] *See* Dkt. 16 at p. 7, para. 18.

The City's ongoing threat of penalization unless Dynamo regulates speech is the "significant encouragement" that the Supreme Court said would establish state action in *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). According to Defendants' own quote from the lease, the contract states that:

> Tenant [Dynamo] agrees that it shall not . . . allow the Leased Premises to be used for the sale or display of any lewd, offensive, or immoral sign or advertisement . . . .[6] The provisions of this . . . shall inure to the benefit of, and be enforceable by landlord [City] . . . .[7]

So, according to Defendants, Dynamo "shall not . . . allow" offensive signs, and if it does, the City may penalize Dynamo for breach.[8] There is no mistaking the effect of this construction: In order to comply with the lease, Dynamo must engage in speech regulation[9]—or else the City may extract contractual penalties from Dynamo. Whether Dynamo is able to enforce the contractual prohibition *against itself* is irrelevant to whether the City encouraged Dynamo to engage in this type of regulation. By Defendants' own recounting, the contract plainly grants Dynamo management powers over the Stadium[10] and requires Dynamo to restrict "offensive" speech, lest the City penalize Dynamo, just as the First Amended Complaint alleges.[11] Dynamo does not need additional contractual powers (least of all, against itself) to comply with the City's directive.

These facts make clear that the City of Houston and Dynamo both have economic and reputational interests in the success of the Stadium, and that the City deputized Dynamo with special privileges that it would not give a normal private tenant managing its property. Dynamo's successful

---

[6] Dkt. 16 at p. 8, n.1.

[7] Dkt. 16 at p. 8, para. 20.

[8] Dkt. 16 at p. 8, n.1. *See* Dkt. 16.7 at pp. 79-81 (describing conditions of "Tenant Default" including failure to perform agreements in the lease, and the available remedies for the landlord).

[9] Defendant also objects that it is "overbroad" and "conclusory" to describe a prohibition on "lewd, offensive, or immoral sign[s]" as a form of speech regulation. *See* Dkt. 16 at pp. 7-8, para. 18. However, Plaintiff is unaware of any legal basis to doubt that signs, including flags, are a form of expression and therefore speech. *See Spence v. State of Washington*, 418 U.S. 405, 410 (1974) ("The Court for decades has recognized the communicative connotations of the use of flags.").

[10] *See* Dkt. 16.5 at pp. 26-29.

[11] Dkt. 12 at p. 6, para. 23; p. 7, para. 27.

barring of perceived offensive signs, aside from being required under its lease agreement with the City, attempts to advance both of these shared interests. And it was in the name of stopping the display of what Mr. Buchanan described as a "racial slur" that Defendants pulled Ms. Hammad from her seat, detained her with a team of security and police, chastised her because a flag representing her ancestry was perceived to be offensive, and ordered her not to wave it.[12]

Defendants' discrimination incident to pursuit of mutual profit is comparable to a private restaurant owner's unlawful profit-seeking arrangement to use public land in *Burton v. Wilmington Parking Authority*. 365 U.S. 715, 723 (1961). In *Burton,* a private tenant operated a restaurant that excluded minorities, but was built on public land and neighbored a government-operated parking garage. *Id.* The Supreme Court held that the discrimination was under color of law because "profits earned by discrimination" contributed to the "financial success of a governmental agency"—through the payment of rent and customers' use of the parking garage. *Id.* at 724.

Similarly, in this case, Dynamo earns profits using the benefit of tax and regulatory exemptions from the City; generates tax revenue for the City; and—in furtherance of those profits—Dynamo excludes people who engage in offensive speech. In a misguided attempt at following this policy, Mr. Buchanan decided that waving the Palestinian flag was a racial slur, and excluded Ms. Hammad. The City is even more directly involved in the relationship with Dynamo than the government was in *Burton* because the City specifically requires Dynamo to engage in content-based regulation of speech in its management of publicly owned land.

The Fifth Circuit applied the entwinement test in *Rundus v. City of Dallas, Tex.*, 634 F.3d 309, 312 (5th Cir. 2011), making clear that the kind of interwoven corporate interests and government privileges present in this case amount to state action. Although the Circuit found the facts of *Rundus*

---

[12] Dkt. 12 at p. 4-5, paras. 15-18.

lacking, it specifically described the circumstances that would amount to entwinement, and Ms. Hammad's case meets this threshold.

In *Rundus*, police helped the private tenant on public land, the State Fair of Texas, eject a trespasser during the fair; the Fair deemed the ejected person a trespasser because he was proselytizing. *Id.* at 313. The Fifth Circuit held that this was insufficient for state action by the State Fair because it "merely … t[ook] advantage of law enforcement services provided to the public" and because Dallas "had no role in enacting or enforcing the restriction on distribution of literature" that the Fair used to deem the ejected person a trespasser. *Id.* at 314-15.

Ms. Hammad's case is not *Rundus*. The First Amended Complaint satisfies both elements which the Circuit thought would have made the State Fair responsible as if it were a state actor:

First, Dynamo is contractually required by the City to prohibit "offensive" speech—which Mr. Buchanan tried to abide by when he ordered Ms. Hammad from her seat, claiming her flag was a "racial slur"—whereas Dallas did not help create the restriction that led to the ejection in *Rundus*.[13] The City gave Defendants an open-ended directive to regulate speech, on pain of contractual penalties, and, after the Defendants concluded that waving a Palestinian flag in these circumstances was a racial slur, the Defendants obeyed the City's directive by excluding Ms. Hammad. Thus, the City instigated the restriction at issue in this case, whereas, in *Rundus*, Dallas took "no role in enacting or enforcing the restriction." *Rundus*, 634 F.3d at 314-15.

Second, also unlike *Rundus*, Dynamo and Mr. Buchanan directly supervise law enforcement as an arm of their in-house security; the police were not merely present to "provide neutral assistance." *Rundus*, 634 F.3d at 314.[14] Mr. Buchanan allegedly supervised the police on site and specifically called them individually, had them surround Ms. Hammad, and finally had them release

---

[13] *See* Dkt. 12 at p. 6, para. 23.

[14] *See* Dkt. 12 at p. 5, para. 21.

her subject to Mr. Buchanan's conditions.[15] This subservient behavior is not how police would respond to calls by the public at large, especially when there is no sign that a crime has been committed. The officers did not merely give the same "law enforcement services provided to the public;" they acted at Defendants' command. *Rundus*, 634 F.3d at 314-15.

These two distinctions are critical because they show commingling of the interests and powers of the government with those of a private corporation, specifically to operate the Stadium and regulate speech there, absent in *Rundus*. The Court should not permit the City to accomplish unconstitutional ends using a private agent. In this case, the City itself would clearly be unable to single out Ms. Hammad just because she is a Palestinian American or just because it believes that the Palestinian flag is inherently more offensive than the flags of other nations—either on the street, in City Hall, or during one of the nine days each year when the City can directly manage the Stadium.

Yet, if Defendants' Motion is granted, the City will continue to benefit from its relationship with Dynamo; to absolve Dynamo of numerous regulations and taxes; and to contractually require that Defendants continue to regulate the content of speech in the Stadium—all without any constitutional protections afforded to those affected by this relationship. Because of the unusually close and interdependent relationship between the City and Dynamo as it relates to the Stadium, Dynamo stands in the City's shoes and bears the City's constitutional responsibilities if it censors speech at the Stadium.

### 2. Defendants acted under color of law because they acted pursuant to a public function delegated by the City.

The public function fulfilled by Dynamo in this case independently demonstrates Defendants acted under color of law. The Stadium is a "publicly owned facility and a traditional forum for free speech,"[16] a status presumed by the lease, which requires Dynamo to censor certain

---

[15] *See* Dkt. 12 at p. 4-5, paras. 15-18.

[16] Dkt. 12 at p. 3, para. 11.

speech and reserves the City's ability to use the Stadium as a public forum. The lease also makes Dynamo exempt from any City ordinance that conflicts with the lease and from most property taxes—similar to a state agency.[17] Dynamo and Buchanan were acting under color of law when they censored speech in the Stadium because the City delegated that public function to Dynamo.

The Fifth Circuit recognizes, under the "public function" test, that a private actor acts under color of law when a government entity delegates to it a "traditionally exclusive public function." *Bass v. Parkwood Hospital*, 180 F.3d 234, 243 (5th Cir. 1999). Although the Fifth Circuit has not addressed the facts of Ms. Hammad's case, even in *Rundus*,[18] at least two other circuits have held that a private company could be liable for its role in managing speech at a traditional public forum, such as a stadium.

*Paulsen v. County of Nassau* addressed a publicly-owned but privately-operated stadium called the Coliseum and its private management company. 925 F.2d 65, 70 (2d Cir. 1991). The court emphasized the actual usage of the Coliseum: "The grounds of the Coliseum have been used for parades, political rallies and speeches, religious weddings . . . circuses . . . [and] rent-free charitable events. Routinely, banners have been displayed by patrons, including some bearing the inscription 'POW's Missing in Action.'" *Id.* The court went on to hold that this pattern of opening the stadium to the public, including for political discourse, bound both the private and government parties to the First Amendment—and, therefore, the private management company could be enjoined to permit noncommercial leafleting. *Id.*

*Lee v. Katz* held that a private entity engaged in state action when it regulated speech in the Rose Quarter Commons, an outdoor area leading to public, city-owned facilities. 276 F.3d 550, 551

---

[17] *See* Dkt. 12 at p. 6, paras. 22-24.

[18] The Fifth Circuit in *Rundus* did not consider the "public function" test or line of cases. *See Rundus*, 634 F.3d at 313 (considering whether the two are sufficiently "entwined in a joint venture"). Defendants cite district court decisions in other circuits about an event center and an equestrian center, but these cases are not pertinent to the Stadium which is, as discussed above, routinely held open for the kind of speech at issue. Dkt. 16 at p. 5-6, para. 14.

(9th Cir. 2002). The private entity leased the Commons and neighboring facilities from the city, using its power as the tenant to exclude citizens based on their speech, including the plaintiffs' street preaching. *Id.* at 551-52. Because the Commons generally remained "a gathering place for public events," including "a multi-faith service," the court held that the Commons was a public forum. *Id.* at 555-56. Further, "regulation of speech in the Commons is a public function and [the private entity] became a State actor when the City delegated that regulation" to the private entity, since that type of regulation is exclusively and traditionally reserved to government. *Id.* at 556-57.

Just as in *Lee* and *Paulsen*, the Stadium in this case is alleged to have routinely permitted the kind of speech which it selectively barred Ms. Hammad from: Defendants permit flag waving at sports events—including flag waving at the event in question—and the Stadium is alleged to be a traditional public forum.[19] Moreover, as a sports stadium, it is characteristic for games to be celebrated with many forms of exuberant expression, just as *Paulsen* noted.

Indeed, in addition to the Second Circuit in *Paulsen*, two other circuits have specifically recognized stadiums as public forums. *See Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1018-19 (D.C. Cir. 1988); *Carreras v. City of Anaheim*, 768 F.2d 1039, 1045 (9th Cir. 1985), *abrogated on other grounds by Los Angeles Alliance for Survival v. City of Los Angeles*, 22 Cal.4th 352 (Cal. 2000).

Accordingly, under the reasoning of this precedent, the City has effectively delegated a public function to a private entity because the Stadium is a public forum which Dynamo has been entrusted to regulate.[20] Dynamo therefore inherits responsibilities under the Constitution when Dynamo is fulfilling that public function. Because all of the alleged acts of Defendants in this case arise from trying to regulate Ms. Hammad's expressive acts in the Stadium, Dynamo and Mr. Buchanan engaged in the public function of regulating speech in a public forum.

---

[19] *See* Dkt. 1 at p. 3, paras. 10-11; p. 4, para. 16; *see also* Dkt. 12 at pp. 3-4, paras. 11-12.
[20] *See* Dkt. 12 at p. 6, para. 24.

**3. Defendants acted under color of law because they acted jointly with police.**

Even without pervasive entwinement or a public function, Dynamo's security manager, Mr. Buchanan, controlled access to the Stadium and coordinated with Defendant police officers.[21] Buchanan's job is to make final security decisions as well as manage staff and uniformed police officers at the Stadium.[22] These allegations, along with the Title II and §1981 violations, are sufficient to show that Dynamo and Buchanan acted jointly with Defendant police in unlawfully detaining Ms. Hammad.

The Fifth Circuit has held that similarly "jointly planned and jointly executed" operations involving both private and state actors make all parties' actions under color of law for the purpose of §1983 liability. *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 387 (5th Cir. 1985). *Auster* involved a private entity which covertly planted a monitoring device at the behest of state troopers, allowing surveillance of the plaintiff's property. *Id.* Dynamo has an even closer relationship with the government, as Mr. Buchanan supervised and literally stood alongside Defendant officers as they both physically blocked Ms. Hammad.[23] As explained above, this is not "merely … tak[ing] advantage of law enforcement services provided to the public;" the public at large cannot take command of police officers based on their own opinion that a particular national flag is offensive. *Rundus*, 634 F.3d at 314-15.

> B. <u>Ms. Hammad alleges facts amounting to specific steps Defendants took to further a conspiracy to violate her rights.</u>

The First Amended Complaint identifies Ms. Hammad's membership in a protected class ("Palestinian American"),[24] alleges that she was told she was removed because she was waving a flag

---

[21] *See* Dkt. 1 at p. 2, para. 8; p. 4, paras. 12, 15.

[22] *See* Dkt. 12 at pp. 4-5, paras. 15-18, 21.

[23] Dkt. 12 at p. 5, para. 21.

[24] Dkt. 1 at p. 2, para. 9.

closely associated with her class (her flag "implied a 'racial slur'"),[25] alleges that she complained about discrimination during the incident;[26] and alleges that the flag was the problem by showing Defendants tried to confiscate it and then backpedaled to only demand Ms. Hammad not wave it.[27]

The First Amended Complaint directly supports Mr. Buchanan's, and thereby Dynamo's, "class-based animus," while the Defendant officers' intent is obvious from their continued cooperation under the circumstances.[28] Mr. Buchanan and Defendant officers knew Ms. Hammad was being detained and forbidden from waving her flag only because it was a Palestinian flag, yet they surrounded her and physically blocked her from returning to her seat until Mr. Buchanan gave permission.[29] In other words, Defendants knew their plan had an unlawful purpose, and they all cooperated with overt acts to further that plan, satisfying the elements of conspiracy.

Nor did Dynamo and Mr. Buchanan merely "take[] advantage of law enforcement services provided to the public."[30] Defendants mischaracterize the complaint, as the officers did not just "respond[] to a call to the scene;" instead, the First Amended Complaint repeatedly alleges specific facts demonstrating not only a conspiracy, but that the police actually acted under the supervision and direction of the private Defendants. These are several examples:

9. . . . Mr. Buchanan is responsible for supervising Defendant Dynamo Stadium's security staff, policy, and on-site uniformed peace officers including Defendant John Doe Houston Police Officers.

14. Mr. Buchanan had instructed two uniformed John Doe Houston police officer Defendants and two security staff to meet him in the concessions area. When Mr. Buchanan lead Ms. Hammad and her boyfriend to the concessions area, he, the two uniformed Defendant police officers, and the two security staff members stood in front of the path back to the arena.

---

[25] Dkt. 1 at 4, para. 14.

[26] *See* Dkt. 1 at p. 4, para. 16.

[27] *See* Dkt. 1 at p. 4, paras. 15-16

[28] *See also* Dkt. 12 at pp. 4-5, paras. 15-18.

[29] *See* Dkt. 12 at pp. 4-5, paras. 15-18.

[30] Dkt. 16 at p. 10, para. 23.

16. As the confrontation escalated, Mr. Buchanan called two more uniformed Defendant police officers and two more security staff members so that all nine of them surrounded Ms. Hammad, blocking the path back to her seat.

17. . . . Mr. Buchanan directed Ms. Hammad's boyfriend to return to his seat, but Mr. Buchanan and a Defendant police officer moved to physically block Ms. Hammad from following.[33]

These allegations sharply distinguish Ms. Hammad's case from those Defendants cite: the police did not "independently investigate[] . . . with minimal involvement by the private parties." *Govea v. ATF*, 207 Fed. Appx. 369, 372 (5th Cir. 2006). And the specific, choreographed actions described above are unlike the case in *Priester v. Lowndes County*, where the plaintiff did not allege "any active participation or significant encouragement" by the state actors. 354 F.3d 414, 423 (5th Cir. 2004).

C. <u>Ms. Hammad alleges facts sufficient to support a claim of discrimination and segregation under Title II of the Civil Rights Act of 1964.</u>

Defendants segregated and discriminated against Ms. Hammad by temporarily removing her from the Stadium because she is a Palestinian American or because she was waving a Palestinian flag, and then by ordering her not to wave her flag, thereby denying her equal enjoyment and benefit of the services provided to other patrons.[34] Defendants' Motion correctly states that segregation is exclusion "from full and equal enjoyment," but then incorrectly narrows this standard in its application to read "totally excluded."[35]

The case Defendants cite, *United States v. Richberg*, did not involve total exclusion, and in fact the segregation in this case is a more subtle version of that in *Richberg*. 398 F.2d 523, 525 (5th Cir. 1968). *Richberg* held there was segregation by a partition between two sides of a restaurant, with required customers to use one side or another based on race—but neither race was "totally excluded" from the restaurant. *Id.* Likewise, Ms. Hammad was allegedly permitted into the Stadium,

---

[33] Dkt. 12 at p. 2-5.

[34] *See* Dkt. 12 at pp. 4-5, paras. 15-18; p. 9, paras. 37-38.

[35] *Compare* Dkt. 16 at p. 11, para. 26 *with* Dkt. 16 at p. 12, para. 27.

but prohibited from staying with the group at the bannister and from waving her flag, whereas other ticketholders could continue to wave their flags because none of their flags represented Palestine.[36]

Defendants nevertheless argue "Plaintiff failed to plead *how* she was discriminated against or segregated" and that she failed to plead "even that she is a member of a protected class."[37] As to Ms. Hammad's membership in or association with a race, ethnicity, or national origin—i.e., membership in a protected class—the First Amended Complaint sets out that:

> 6. . . . Ms. Hammad . . . is an American citizen of Palestinian descent.
> 10. Buthayna Hammad, a Palestinian American woman . . . also carried the Palestinian flag.
> 12. . . . Ms. Hammad took part with this group, waving her Palestinian flag.
> 15. Mr. Buchanan demanded to know why she [Ms. Hammad] had brought the Palestinian flag. She replied that she did so to represent and support Honduras while also representing herself as a Palestinian American.
> 31. [Ms. Hammad] was Palestinian American and waving a Palestinian flag . . . .
> 37. [Ms. Hammad] was a Palestinian American waving a Palestinian flag.[39]

Ms. Hammad's Palestinian descent constitutes membership in a protected class. As the First Amended Complaint states, these stem from "her race, ethnicity, or national origin"[40]—protected classes under Title II. 42 U.S.C. §2000a(a).

As to "*how* she was discriminated against or segregated," the crux of the First Amended Complaint is that Defendants targeted Ms. Hammad because she—a Palestinian American—waved a Palestinian flag. Plaintiff even alleges Mr. Buchanan said that Ms. Hammad's flag "implied a 'racial slur.'"[41] Meanwhile, other fans—with other ancestry and waving other flags—were not singled out to have their attendance interrupted, were not surrounded by police, and did not have their flags

---

[36] *See* Dkt. 12 at p. 5, para. 18.

[37] Dkt. 12 at p. 13, para. 28.

[39] Dkt. 12 at pp. 2-4, 8-9.

[40] Dkt. 12 at p. 9, para. 37.

[41] Dkt. 12 at p. 4, para. 15.

labeled a "racial slur." Defendants did each of these things to Ms. Hammad and prohibited her from waving a flag associated with her ancestry, whereas attendees descended from other nations could freely wave their nations' flags.[42]

As to injunctive relief, Ms. Hammad specifically alleges her plans to continue attending soccer games with her flag. This and the allegation that Dynamo's agent, Buchanan—who is still the head of security[43]—expressed his belief that the flag "implied a 'racial slur'" support a reasonable likelihood that similar discrimination or segregation will recur when she attends another match and tries to wave the same flag.[44]

### D. Ms. Hammad alleges facts supporting a claim of discrimination under 42 U.S.C. §1981.

The essence of Ms. Hammad's §1981 claim is that Defendants discriminated by giving a specific benefit to other ticketholders, but not to her. Everyone who was not of Palestinian descent could bring a flag representing their national ancestry and wave it as a part of celebrating the game and cheering for their teams. In contrast, Defendant ordered Ms. Hammad out of the Stadium for much of the game; then detained and chastised her because her flag "implied a 'racial slur.'"[45]

This lawsuit does not need to address whether Ms. Hammad's ticket expressly promised the ability to wave of flags like everyone else, because the practice was a benefit that Defendants afforded other fans but denied her on impermissible grounds.

Defendants incorrectly argue that Ms. Hammad must allege violation of "a specific guarantee in a contract"[46] for a §1981 claim. The statute expressly prohibits impermissible discrimination in the performance and enjoyment of the contractual relationship—whether or not that performance and

---

[42] *See generally* Dkt. 12 at p. 4, paras. 12-15; p. 5, para. 18; p.7, para. 29; p. 9, para. 37.

[43] Dkt. 12 at p. 5, paras. 20-21.

[44] *See* Dkt. 12 at p. 4, para. 15.

[45] *See* Dkt. 12 at pp. 4-5, paras. 15-18.

[46] Dkt. 16 at p. 15, para. 33.

enjoyment is expressly guaranteed. *See* 42 U.S.C. §1981.[47] The only cases which Defendants cite do not support the unduly narrow reading of the statute which Defendants propose: *Domino's Pizza, Inc. v. McDonald* only held that, while a corporation has standing to assert a §1981 claim, its sole shareholder may not assert that claim personally on his own behalf. 546 U.S. 470, 475 (2006).[48] Also unrelated to Defendants' argument, *Morris v. Dillard Dept. Stores, Inc.* rejected a §1981 claim in part because it was based on a "speculative or prospective contract interest" where the plaintiff had not yet entered into any contract. 277 F.3d 743, 751-52 (5th Cir. 2001).[49]

Accordingly, there is no reason to allege the entire contents of Ms. Hammad's contract, because Ms. Hammad states a claim by asserting the existence of a contract in which she has rights and impermissibly discriminatory performance on that contract by Defendants. This is especially true given the potential enormity and complexity of the Stadium rules incorporated into the ticket (and the ticket's own admonition against copying).[50]

E. <u>Ms. Hammad alleges facts sufficient to support a claim of false imprisonment.</u>

When Defendants removed Ms. Hammad from the Stadium and surrounded her, they restricted her freedom of movement from one place to another.[51] This restriction on movement, if unreasonable, is a "detention" under the doctrine of false imprisonment, regardless of the length of the restraint. *See Randall's Food Markets,* 891 S.W.2d at 644-45 ("A detention may be accomplished by

---

[47] "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42. U.S.C. §1981.

[48] "The right to 'make contracts' guaranteed by the statute was not the insignificant right to act as an agent for someone else's contracting." *Domino's Pizza, Inc. v. McDonalds*, 546 U.S. 470, 475 (2006).

[49] "It is uncontroverted that Morris left Dillard's of her own accord without attempting to make any purchase, or to engage in any other transaction with Dillard's prior to, during, or subsequent to her detention and arrest . . . ." *Morris v. Dillard Dept. Stores, Inc.*, 277 F.3d 743, 751-52 (5th Cir. 2001).

[50] *See* Dkt. 16.12 at p. 3 ("each of the Releasees reserves the right . . . to refuse admission to or eject any person who fails to comply with management or facility rules. . . . It is unlawful to reproduce this ticket in any form.").

[51] *See* Dkt. 12 at pp. 4-5, paras. 14-17.

violence, by threats, or by any other means that restrains a person from moving from one place to another."). Defendants' Motion contradicts itself, stating that the First Amended Complaint fails to allege "Plaintiff was … restrained by physical force," but then repeats the allegation that "[t]he security manager initially 'physically blocked Ms. Hammad from following.'"[52] Even standing alone, this physical restraint satisfies the requirement of a detention for false imprisonment. *Id.*

Finally, Defendants' Motion claims that the First Amended Complaint is "internally inconsistent" because Plaintiff was allegedly "required to surrender her flag and prevented from returning to her seat," yet she appears in her seat, with her flag, in the photo included in the Complaint.[53] Defendants are incorrect. In paragraphs 15 through 18, Ms. Hammad alleges Defendant initially ordered her to give up her flag and threatened to bar her from returning to her seat until she did so. The complaint goes on to allege that it was only later in time that Mr. Buchanan changed his demand. Defendant's second demand was that Ms. Hammad not wave her flag.[54]

## CONCLUSION

Plaintiff respectfully asks that Defendants' Motion to Dismiss be denied because her First Amended Complaint properly states claims against the Defendants that Dynamo's pervasive entwinement with the City of Houston, as well as Dynamo's responsibility for an exclusively public function, means that Defendants acted under color of law and are liable under §1983. Even if they did not, Defendants violated §1981 when they harassed Ms. Hammad on the basis of her Palestinian descent amounting to discrimination on the basis of race, ethnicity, or national origin.

Moreover, these same actions violated Title II. Defendants also directed and acted literally alongside uniformed police when they detained Ms. Hammad without a legal basis. This was both an independent violation of §1983, under color of law by reason of joint action, and a conspiracy to

---

[52] Dkt. 16 at pp. 16-17, para. 36.

[53] Dkt. 16 at p. 16, para. 34.

[54] *See* Dkt. 12 at pp. 4-5, paras. 15-18.

violate rights under §1985. In turn, the Defendants' actions in detaining Ms. Hammad were unlawful and therefore false imprisonment under Texas common law.

Dated: November 3, 2014.

        Respectfully Submitted,

        /s/ Amin Alehashem
        Amin Alehashem
        Texas Bar No. 24073832

        S. Dist. No. 1134538
        TEXAS CIVIL RIGHTS PROJECT--HOUSTON
        2006 Wheeler Ave.
        Houston, Texas 77004
        ATTORNEY IN CHARGE

        James C. Harrington
        S. Dist. No. 4025
        State Bar No. 09048500
        Wayne Krause Yang
        Texas Bar No. 24032644
        TEXAS CIVIL RIGHTS PROJECT
        1405 Montopolis Drive
        Austin, TX 78741
        (512) 474-5073 (phone)
        (512) 474-0726 (fax)

        ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

     I hereby certify that a true and correct copy of the foregoing has been served upon all known counsel of record in accordance with the Federal Rules of Civil Procedure on November 3, 2014.

        /s/ Amin Alehashem
        Amin Alehashem