United States District Court
Southern District of Texas

**ENTERED**

November 10, 2015

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BUTHAYNA HAMMAD, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-14-1938 |
| | § | |
| DYNAMO STADIUM, LLC, *et al.*, | § | |
|     Defendants. | § | |

## MEMORANDUM AND ORDER

Plaintiff Buthayna Hammad alleges that Defendants Dynamo Stadium, LLC ("DSL") and Nathan Buchanan violated her civil rights when they prevented her from waving a Palestinian flag at a soccer match between Israel and Honduras. Defendants have filed a Motion for Summary Judgment [Doc. # 44] ("Motion") seeking dismissal of all of Plaintiff's claims. Plaintiff has filed a Response [Doc. # 56], and Defendants filed a Reply [Doc. # 60]. The Motion now is ripe for decision. Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court concludes that Defendant's Motion should be **granted**.[1]

---

[1] Several other matters currently are pending. First, Defendants filed Objections [Doc. # 61] to Plaintiff's summary judgment evidence, and Plaintiff has responded [Doc. # 68] to the objections. Defendants object to multiple exhibits, including all deposition transcripts provided by Plaintiff, as unauthenticated. Defendants also object to Plaintiff's two declarations, and to photographic and video exhibits, among other objections. Because the contested evidence is not dispositive of the issues before the Court, Defendants' Objections will be **overruled as moot**. Second, Defendants'

(continued...)

## I.  BACKGROUND

Plaintiff Buthanyna Hammad complains of discriminatory treatment and other wrongs that allegedly occurred at a soccer match played at BBVA Compass Stadium (the "Stadium") between the national teams of Israel and Honduras on June 1, 2014 (the "Match").  She brings this action against two Defendants: DSL, a private entity that is the tenant and manager of the Stadium, and Nathan Buchanan, DSL's security director.  Plaintiff initially sued John Doe officers of the Houston Police Department, but voluntarily dismissed these defendants with prejudice on October 9, 2015.  *See* Doc. # 67.

Because Plaintiff brings some claims that require proof of state action, the Court first recounts the facts relevant to government involvement with the Stadium. The Court then will address the events at the Match and the alleged civil rights violations.

### A.  Government Involvement in the Stadium

Defendant DSL is the "Tenant" of the Stadium pursuant to a lease entered into

---

[1]  (...continued)
Motion to Strike [Doc. # 64], which pertains to Plaintiff's "Corrections" [Doc. # 63], will be **denied**.  Third, Plaintiff's Motion to Strike [Doc. # 68], which pertains to Defendants' Objections [Doc. # 61], will be **denied**.  Finally, Plaintiff has filed a Motion for Spoliation Holding and Request for Negative Inference Instruction [Doc. # 57], to which Defendants have responded [Doc. # 62].  For the reasons stated herein, Plaintiff's spoliation motion will be **denied**.

on February 18, 2011.  Lease and Development Agreement [Docs. # 16-6, # 16-7, # 16-8, and # 16-9] (the "Lease").  DSL is a Delaware limited liability company.  The Landlord under the Lease is the Harris County Houston Sports Authority ("HCHSA").  HCHSA is a government entity.  *See* Lease, at 1 (opening paragraph identifies HCHSA as "a sports and community venue district created under Chapter 335 of the Texas Local Government Code"); TEX. LOC. GOV'T CODE § 335.023(a) ("A [sports and community venue] district is a political subdivision of the creating political subdivisions and of this state").

By the terms of the Lease, DSL as Tenant committed to "design, develop and construct" the Stadium "at [DSL's] sole cost, risk and expense."  Lease, at 13 § 9.1.1.  DSL has "full and exclusive control of the management and operation of the Leased Premises."  *Id*. at 3 § 3.2.4.

Plaintiff points out that the Stadium is on publicly owned land and argues that DSL receives considerable benefits from HCHSA under the Lease, including low annual rent and tax breaks.  Plaintiff further argues that HCHSA and DSL have mutual interests in fostering social engagement, civic pride, and economic activity.  Response, at 7 & nn. 10-13 (citing, *inter alia*, Lease, at 29-30 § 12.3.2; Economic Development Agreement between City of Houston and DSL (Exhibit 18 to Response), at 4).

Because Plaintiff alleges that Defendants prevented her from waving her

Palestinian flag at the Match, the parties have cited certain rules and provisions regarding displays of signs and banners at the Stadium.  Plaintiff cites to Section 12.2(c) of the Lease, which requires DSL, as Tenant, to prohibit the "sale or display of any lewd, offensive or immoral sign" in the Stadium.  Lease, at 28 § 12.2(c).  In addition, DSL has generated guidelines that pertain to guests' use of flags, banners or signs, including rules prohibiting blockage of stadium signage, standing in aisles, and taunting other fans.[2]  Although Plaintiff characterizes these guidelines as DSL's "implementation" of the Lease provision, she has produced no evidence in support of this contention.  Defendants maintain that HCHSA had no input into or oversight of DSL's rules and guidelines.  Reply, at 5 (citing Hall Deposition (Exhibit D-148 to Motion), at 33).

### B.    The Match and the Parties' Conduct

Plaintiff Hammad had a ticket to the Match between Honduras and Israel.  She attended the event with her boyfriend, Jonathan Morales, and members of his family.  Plaintiff was born a United States citizen in Saudi Arabia and identifies as Palestinian-American.  Plaintiff's Deposition (Exhibit O-153 to Motion), at 13-14.

---

[2]    Defendants have provided screen shots of some of these policies, which are posted on the Stadium's website.  *See* Stadium A-Z Guide, Banners and Signs (Exhibit A-3 to Motion); Prohibited Items (Exhibit B-123 to Motion);  Stadium A-Z Guide, Standing (Exhibit W-159 to Motion);  Stadium A-Z Guide, Guest Conduct (Exhibit W-160 to Motion).

When Plaintiff and Morales entered the Stadium for the Match, they passed through security.  Security checked Plaintiff's purse, which contained a Palestinian flag.  Plaintiff and Morales then went to their seats.

The Match lasted approximately ninety minutes, and each half was approximately forty-five minutes.  At some point during the first half of the Match, Plaintiff and Morales left their seats and walked down about ten steps to a landing at Section 226 of the Stadium.  Plaintiff draped the Palestinian flag over the railing. Defendants maintain that a stadium sign (in particular, an LED board) was below the railing and was obstructed by Plaintiff's flag.  Plaintiff states that numerous fans at the Match were waving various national flags, and that other flags also blocked Stadium signage.  Response, at 8-9 & nn. 20-22, 15-16 & nn. 63-69 (citing deposition, photographic, and videographic evidence).

The landing where Plaintiff and Morales were standing was directly across from High Command, a command post at the top of the Stadium that coordinates security and guest services during an event.  Amber Goodspeed is Director of Event Services for DSL and supervises High Command.  She was at the post during the Match and observed Plaintiff and Morales on the landing.

By Plaintiff's account of events, three DSL personnel made preliminary requests that she move her flag.  Response, at 9-10.  *See* Plaintiff's Deposition

(Exhibit O-153 to Motion), at 22-25, 30-32.   First, a Stadium representative on the field, in a red shirt, signaled to her to move raise the flag higher.  Second, when the flag apparently still covered the signage, a person on the second tier made a "cut it out" signal to Plaintiff.  Plaintiff states that after she raised the flag so that it was no longer covering the sign, she got a "thumbs up" sign from that representative. Thereafter, a "security or ticket guy" came up the stairs from behind Plaintiff and Morales and asked them to take their seats.  Defendants' account is substantially similar, although, as noted below, there is conflicting evidence in the record as to whether Plaintiff and Morales then went to their seats or remained at the railing.

At  some  point  during  or  after  these  preliminary  requests,  a  Stadium representative radioed High Command to ask for assistance.  Goodspeed, at High Command, then contacted Buchanan by radio and asked him to respond to what she considered an unresolved security situation.  Goodspeed testified that she had used binoculars to get a good look at the flag, and used a Google search to identify it. Goodspeed Deposition (Exhibit M-152 to Motion), at 69-70, 72-74.  She further testified that she told Buchanan that Plaintiff "had a Palestinian flag" and that "it could be seen as a racial slur."  *Id.* at 72.  *See id.* at 74 ("There were possibly Israeli fans around that could be offended").  At 8:26 pm, the incident was logged as Incident

# 25 by High Command and described as "inappropriate conduct."[3]

Buchanan arrived at Section 226 with Edgar Bustamante, the manager for 5Star Event Services.  The summary judgment record contains conflicting evidence as to whether Plaintiff was at the railing or in her seat when Buchanan and Bustamante arrived.  Although the majority of the evidence in the record suggests that Plaintiff was standing at the railing when approached by Buchanan, Plaintiff testified at her deposition that she was in her seat, and cites to some record evidence in support.[4]  For purposes of the instant summary judgment motion, because Plaintiff is the non-

---

[3]    Event Summary B-122.  The summary, which apparently was generated by the Stadium, stated as follows:

> Two patrons wearing Honduras jerseys are waving a Palestinian flag and block the upper LED board.  Flag needs to be checked into Guest Services.  5star is escorting guest to customer service to check in flag. Act could be derogatory slur against Israel. . . .

*Id.*, at 9.

[4]    Plaintiff cites to her deposition testimony and her declarations, as well as Admissions by the Stadium and Buchanan admitting (subject to objections) that Buchanan met Plaintiff "at her seat."  Response, at 10 & n.42.  By contrast, Plaintiff's boyfriend Morales testified that he and Plaintiff were standing when Stadium personnel approached from behind.  Morales Deposition (Exhibit R-154 to Motion), at 33-34; Morales Deposition (Exhibit S-145 to Motion), at 85-86.  Bustamante also testified that Plaintiff and Morales were standing at the railing when he and Buchanan approached.  Bustamante Deposition (Exhibit I-150 to Motion), at 33-34 (Bustamante testified that Plaintiff was standing on a landing, was facing away from the field, and was "taunting" other fans).  Buchanan testified at deposition that he could not remember whether Plaintiff was sitting or standing when he approached her. Buchanan Deposition (Exhibit F-149 to Motion), at 62.

movant, the Court will assume that Plaintiff was in her seat, and was not blocking signage or taunting other fans, at the time Buchanan first addressed her.  This factual dispute is material to whether Buchanan approached Plaintiff because of rules violations, or because of the identity of her flag.

At Buchanan's instruction, Plaintiff and Morales left the seating area with him and walked down to the concourse, where the concession stand was located.  In her deposition, Plaintiff testified that, when she and Buchanan reached the concourse, they were met by two uniformed police officers and an additional Stadium employee, and that two additional officers arrived later as she was speaking with Buchanan.  She stated that the officers and the additional Stadium personnel did not speak with her or with Morales, and that they did not speak with Buchanan in her presence. Plaintiff's Deposition (Exhibit O-153 to Motion), at 34-36.

The parties disagree as to what Buchanan initially said to Plaintiff on the concourse.  Buchanan testified that he asked Plaintiff why she was failing to comply with instructions, noting that she had been told three times not to block the Stadium's signs.  Buchanan Deposition (Exhibit G-149 to Motion), at 72-73.  In contrast, Plaintiff testified at deposition that Buchanan asked her why she was "carrying that flag."  Plaintiff's Deposition (Exhibit O-153 to Motion), at 42-43.  For purposes of this summary judgment motion, viewing the evidence in the light most favorable to

Plaintiff, the Court will credit Plaintiff's version of this exchange.

In any event, the parties agree that, during their discussion, Plaintiff told Buchanan that she was carrying the Palestinian flag because she is Palestinian. Plaintiff's Deposition (Exhibit O-153 to Motion), at 42; Buchanan Deposition (Exhibit G-149 to Motion), at 76.    Buchanan states that he did not know the identity of the flag until that moment, and Plaintiff concurs with that impression.[5] Plaintiff states that when she explained to Buchanan that it was a Palestinian flag, Buchanan responded that Palestine was not playing and said told her that she could not keep the flag:

> When I told him, because I'm Palestinian, I'm representing Honduras, that's when he said, Well, you can't have that flag.  And I asked why. He goes, Because it implies a racial slur.  . . . . And I asked him why he thinks it's a racist . . . flag.  And I even said, I think it's racist to say that a person's national flag could be implied as a racial slur.  And then he said, Well, you can't have that flag.

Plaintiff's Deposition (Exhibit O-153 to Motion), at 43.  *See* Buchanan Deposition (Exhibit G-149 to Motion), at 106 ("I said, 'It could imply a racial slur'").

Buchanan told Plaintiff that she would have to give up or "check" the flag before returning to her seat.  Plaintiff's Deposition (Exhibit O-153 to Motion), at 43-44.  Buchanan permitted Morales, who did not have a flag, to go up back up the stairs

---

[5]    *See* Plaintiff's Deposition (Exhibit Q-153 to Motion), at 141 ("I don't think that he knew what [the flag] was.  I don't . . . . think that he was . . . . trying to, you know, spitefully or intentionally be hateful.  I honestly think he just didn't know").

to his seat.  When Plaintiff moved to follow Morales, she states that Buchanan put up his hands, blocked her path, and she could not take her seat "until [she] gave him that flag."  *Id*. at 44-45.[6]  Plaintiff protested, telling Buchanan that she got the flag in Bethlehem, and asked if she could instead put the flag in her purse or bag.  She states that Buchanan refused.   At this point, she was upset, did not understand Buchanan's reasons, and "kept on saying" that "[her] flag is not a racist flag."  *Id*. at 45.[7]   By her account, Plaintiff explained to Buchanan that she was attending the Match with her Honduran boyfriend and his extended family, and was there to support Honduras.  She told him that she did not understand why she was being "singled out."  Plaintiff's Deposition (Exhibit O-153 to Motion), at 45-46.

Plaintiff and Buchanan then arrived at a compromise: Plaintiff was permitted to keep her Palestinian flag and return to her seat, but would not wave the flag. Buchanan Deposition (Exhibit G-149 to Motion), at 78; Plaintiff Deposition (Exhibit O-153 to Motion), at 46.  Plaintiff testified that Buchanan then gave Plaintiff his business card and they shook hands, and that she then returned to seat with her flag

---

[6]     *See* Morales Deposition (Exhibit S-154 to Motion), at 45 (Morales testified that Buchanan permitted Morales to return to his seat, but stated that Plaintiff could not return to her seat with the flag).

[7]     *See* Buchanan Deposition (Exhibit G-149 to Motion), at 78 (after Plaintiff refused to give up her flag and Morales was permitted to return to his seat, Plaintiff told Buchanan that he was violating her First Amendment rights).

"draped around her shoulders." *Id.* at 46, 48.

Plaintiff states that her encounter with Buchanan lasted no more than twenty minutes. Plaintiff's Deposition (Exhibit P-153 to Motion), at 50. *See* Morales Deposition (Exhibit S-154 to Motion), at 47. The Event Summary produced by Defendants states that the incident was logged at 8:26 p.m. and resolved at 8:40 p.m. Event Summary (Exhibit B-122 to Motion).

For the remainder of the Match, Plaintiff had no further incident with Stadium security and retained possession of her flag. She testified that she walked to a concession stand at halftime with the flag draped over her shoulders and down her back, and left the Stadium the same way after the Match, without incident. Plaintiff's Deposition (Exhibit P-153 to Motion), at 50-52; Morales Deposition (Exhibit S-154 to Motion), at 51-56.

After the Match, Doug Hall, who at the time was General Manager for DSL, met with Buchanan. Hall told Buchanan that "he should not have used the words 'racial slur'" because the phrase was "a poor choice of words," but that otherwise Buchanan had handled the incident appropriately. Hall Deposition (Exhibit E-148 to Motion), at 103-04. Buchanan agreed with Hall that his word choice was poor. Buchanan Deposition (Exhibit H-149 to Motion), at 140-43. Buchanan refers in his deposition testimony to a written apology from Hall regarding "stadium personnel's

11

use of inappropriate language to describe the Palestinian flag." Buchanan Deposition (Exhibit G-149 to Motion), at 74. Buchanan's deposition testimony does not expressly indicate to whom the letter was written.

On July 26, 2014, Plaintiff attended another soccer match at the Stadium and sat with a group that displayed several Palestinian flags. Plaintiff's Deposition (Exhibit P-153 to Motion), at 61. Plaintiff apparently had contacted Stadium personnel proactively before the July 26 match and told them that she wanted to bring her Palestinian flag and was hoping to avoid a repeat of the issues at the previous Match. Plaintiff Deposition (Exhibit Q-153 to Motion), at 156-57, 159-60. She states that she took the same Palestinian flag that she had taken to the Match, along with "some little ones," and that she was not aware of any flag that day blocking signs or the view of other fans. Plaintiff's Deposition (Exhibit P-153 to Motion), 88-90. Plaintiff testified that she had no incident with Stadium personnel during the July 26 match, and that Stadium personnel did not prevent her from displaying her Palestinian flag at that game. Plaintiff's Deposition (Exhibit Q-153 to Motion), at 159-60.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).  The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'"  *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001)

(internal citation omitted).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the nonmoving party.  *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant.  *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002), *overruled in part on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts which show "the existence

of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The Court may make no credibility determinations or weigh any evidence. *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-413).  The Court is not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Id*. (citing *Reaves Brokerage*, 336 F.3d at 413).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.  *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).  A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the

contrary. *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

Finally, although the Court may consider all materials in the record when deciding a summary judgment motion, "the court need consider only the cited materials." FED. R. CIV. P. 56(c)(3). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (internal citations and quotation marks omitted).

## III.   ANALYSIS

Plaintiff brings claims for violations of the First and Fourteenth Amendments under 42 U.S.C. § 1983;  for violation of her contract rights under 42 U.S.C. § 1981; for injunctive relief under Title II's public accommodations provisions; and for false imprisonment under Texas law.[8]  Defendant moves for summary judgment and dismissal of all claims.

### A.   Section 1983 Claims for Violations of First and Fourteenth

---

[8]    Although Plaintiff originally brought additional claims under the Fourth Amendment (Section 1983) and 42 U.S.C. § 1985, she voluntarily dismissed these claims on October 9, 2015. *See* Order [Doc. # 67] (granting Plaintiff's Unopposed Motion to Dismiss Fourth Amendment Claims and Section 1985 Conspiracy Claims with Prejudice and Motion to Dismiss Party with Prejudice [Doc. # 66]).

**Amendments**

Defendants argue that Plaintiff's Section 1983 claims fail because Defendants are not state actors, and also because Defendants did not violate Plaintiff's constitutional rights. Because the state action issue is dispositive of all Section 1983 claims, the Court considers state action before addressing the merits of Plaintiff's claims under the First and Fourteenth Amendments.

A plaintiff bringing a claim under Section 1983 must show that his or her rights were violated by a person acting "under color of law":

> Every person who, ***under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia***, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983 (emphasis added). A plaintiff may meet this "state action" requirement by showing either that the defendant's deprivation resulted from "an official [state] policy or custom," or that the defendant's conduct in the alleged deprivation was "fairly attributable" to the government. *Rundus v. City of Dallas, Tex.*, 634 F.3d 309, 312 (5th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)). *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295

(2001).

Defendants DSL and Buchanan are private actors.  However, Plaintiff argues that their conduct at the Match was "fairly attributable" to HCHSA, a government entity, because of the "pervasive entwinement" between Defendants and HCHSA.[9] When a private entity is sufficiently entwined with a governmental entity, the private entity functions as a state actor.  *Brentwood,* 531 U.S. at 296-97; *Jatoi v. Hurst-Euless-Bedford Hosp. Auth.*, 807 F.2d 1214, 1220-22 (5th Cir. 1987).  The courts look to financial and managerial entwinement between the private and public entities.  *See Jatoi*, 807 F.2d at 1221.  They also examine whether the governmental entity was directly involved in the action by private defendants that allegedly violated the plaintiff's rights.  *Rundus*, 634 F.3d at 313-15 (surveying cases).

Plaintiff's briefing makes eight points as support for "pervasive entwinement" between Defendants and HCHSA, seven of which pertain to financial or managerial entwinement.  In particular, Plaintiff claims as follows:

---

[9]  A plaintiff may establish that a private defendant is converted to a "state actor" by various tests, including the "pervasive entwinement," or nexus, test.  *Lugar*, 457 U.S. at 939 (citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974); *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961)).  Other tests used by the courts include the public function test, the state compulsion test, and the joint action test.  *Id.*  These tests often overlap with each other, and the court's inquiry is "necessarily fact-bound."  *Id.  See Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (discussing the four tests by which a plaintiff may show state action).   Plaintiff's summary judgment briefing makes no argument under any test other than "pervasive entwinement."  *See* Response, at 22-26.

    (1)     the Stadium uses HCHSA's publicly owned land;

    (2)     the Stadium is generally exempt from City and County regulations and ordinances that are contrary to the Lease between DSL and HCHSA;

    (3)     the Stadium is exempt from certain local taxes;

    (4)     the Stadium is open to the public for the Houston Dynamo's home games as required by HCHSA and the Lease;

    (5)     the Stadium is open to the public for government-run ceremonies and events as required by the Lease;

    (6)     the Stadium works together with HCHSA to bring events to Stadium; and,

    (7)     the Stadium has a business model that seeks to foster social engagement and civic pride.

Response, at 24-25.[10]  Defendants argue that Plaintiff's allegations are conclusory, unfounded, and contrary to the evidence.  The Court need not address the evidentiary issues raised by Defendants because, even assuming that Plaintiff could properly prove all alleged facts regarding financial entwinement, such evidence would be insufficient to prevent summary judgment.

In *Rundus*, which involved the State Fair of Texas, a private organization, the Fifth Circuit rejected many arguments for entwinement that were similar to Plaintiff's

---

[10]    Plaintiff's eighth argument regarding entwinement is that DSL regulates "speech" in the Stadium pursuant to its Lease with HCHSA.  This point pertains to Plaintiff's argument that Defendants were directly involved in the actions against her, rather than to financial entwinement, and is addressed below.

seven arguments above. In particular, the *Rundus* Court declined to find state action despite evidence that the Fair held its event on public land, made rent payments to the city, collaborated with the city on grant applications and long-term planning, enjoyed rent abatements for making certain improvements to the premises, opened its event to the ticketed public, and was assisted during its event by 160 police officers assigned by the city. *Rundus*, 634 F.3d at 311-12 & n.3. Although Plaintiff also makes certain allegations not specifically addressed by *Rundus*, such as preferential tax arrangements and the common goal of civic pride, she cites no authority holding that such evidence could suffice to show state action, especially in light of the *Rundus* holding.

Plaintiff relies upon *Jatoi*, a 1987 Fifth Circuit case that held that the private management of a public hospital district was pervasively entwined with the state. In *Jatoi*, the hospital was publicly owned, had been built with public funds, was created by statute, had a public purpose, resulted in financial benefit to the city, and had originally been run by the government before being managed by the private non-profit corporation that was the defendant in the suit. *Jatoi*, 807 F.2d at 1217, 1221. In addition, the public hospital authority continued to hold the hospital's purse strings. By contrast, in the case at bar, there is no public ownership or public funding of the Stadium. *See* Lease, at 13 § 9.1.1 (DSL as Tenant committed to "design, develop and

construct" the Stadium "at [DSL's sole cost, risk and expense" ). As made clear in *Rundus*, the fact that the Stadium is located on public land is insufficient. *Rundus*, 634 F.3d at 315. Plaintiff has failed to demonstrate a genuine issue of material fact as to financial and managerial entwinement.

Moreover, even assuming that Plaintiff had demonstrated financial entwinement, Fifth Circuit precedent also requires a showing that the governmental entity in question was directly involved in the allegedly unconstitutional conduct. *Rundus*, 634 F.3d at 315 (no state action because, *inter alia*, the city was not involved in enacting or enforcing the State Fair of Texas' rules against distribution of literature). *See Blum v. Yaretsky*, 457 U.S. 991 (1982) (private nursing home that was licensed by state and received state subsidies for facility costs and state payments for patient expenses was not state actor when it made decisions to discharge or transfer its patients; patient decisions turned on the professional, medical judgments of private parties, and there was no sufficient evidence that the private judgments were influenced by the state); *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) (private, nonprofit school did not function as state actor when discharging employees, despite receipt of public funds; the discharge decision was not compelled or influenced by any state regulation). In other words, to survive summary judgment, Plaintiff must demonstrate a genuine issue of material fact that HCHSA was involved in Defendants'

actions to prevent her from waving her Palestinian flag at the Match.

Plaintiff makes only one argument regarding HCHSA's involvement in the incident: she contends that Defendants' actions at the Match were an attempt to "regulate[] speech" in the Stadium and were motivated or compelled by Section 12.2 of the Lease between HCHSA and DSL.  Response, at 25.  Section 12.2(c) of the Lease provides as follows:

> Tenant [DSL] agrees that it shall not . . . . Use or allow the Leased Premises to be used for the sale or display of any lewd, offensive or immoral sign or advertisement, including any sign or advertisement that promotes lewd, offensive or immoral activities, including sexually immoral activities.

Lease, at 28 § 12.2(c).    Plaintiff apparently argues that, because Buchanan characterized Plaintiff's Palestinian flag as a "racial slur," he was prohibiting the display of an "offensive . . . sign" under Section 12.2(c).

Plaintiff's argument is speculation.  She has presented no evidence that Defendants invoked or relied upon this provision of the Lease, or any purported requirements from HCHSA, when taking the actions about which she complains. Although Plaintiff argues that DSL's rules regarding flags were generated to comply with Section 12.2(c) of the Lease, no record evidence supports her allegation.[11]

---

[11]    DSL has generated its own guidelines and rules regarding guest conduct and permitted items, which guidelines cover guest use of flags, banners or signs, including
(continued...)

Plaintiff also has presented no evidence that HCHSA compelled or influenced the conduct of Buchanan or DSL before, during, or after the Match.[12]

This absence of evidence regarding HCHSA's involvement is fatal to Plaintiff's claim of state action. *See Rundus*, 634 F.3d at 315. *Jatoi*, the case cited by Plaintiff regarding state action, further supports the holding that a plaintiff must show the defendant's direct involvement in the alleged violation. In that case, the state action finding was supported by the fact that the public hospital authority was aware of the plaintiff's termination by hospital management, and had retained the ability to prevent or control racial discrimination. *See Jatoi*, 807 F.2d at 1221-22. Subsequent Fifth Circuit cases have highlighted *Jatoi*'s requirement that the state be involved in the specific discriminatory content, and have rejected the plaintiff's claims of state action when evidence of such direct involvement was lacking. *See Yeager v. City of McGregor*, 980 F.2d 337, 343 (5th Cir. 1993); *Albright v. Longview Police Dep't*, 884

---

[11]    (...continued)
rules prohibiting blockage of stadium signage, standing in aisles, and taunting other fans. *See* Motion, at 4-5 (citing record). Defendants maintain that HCHSA had no input or oversight of DSL's rules and guidelines, *id.* at 5 (citing Hall Deposition (Exhibit D-148 to Motion), at 33), and Plaintiff has cited no evidence to the contrary.

[12]    To the contrary, the summary judgment evidence shows that the incident in question arose during the Match and that Defendants and Plaintiff resolved the incident within twenty minutes, when Plaintiff returned to her seat with her flag. There is no evidence that HCHSA reviewed or directed Defendants' conduct at any time.

F.2d 835, 840 (5th Cir. 1989).[13]

In sum, Plaintiff has presented no competent summary judgment evidence that HCHSA was involved in, or somehow compelled or influenced, the challenged actions by Defendants.  On this basis, as well as Plaintiff's failure to demonstrate financial entwinement, Plaintiff has not demonstrated a genuine issue of material fact regarding state action.

Given this holding that Defendants' challenged actions against Plaintiff were not "fairly attributable" to HCHSA or any state actor, Plaintiff's Section 1983 claims must fail.  The Court therefore does not address the merits of Plaintiff's claims under the First and Fourteenth Amendments.

## B.    Section 1981 Claim

Plaintiff brings a claim under Section 1981, which prohibits racial discrimination in the making or enforcing of contracts:

All persons within the jurisdiction of the United States shall have the

---

[13]    Two other cases cited by Plaintiff, both of which find a fact question regarding state action, also rely on the defendants' direct involvement in the challenged conduct. *See Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263 (11th Cir. 2003) (in a First Amendment case regarding rejection of a bus shelter advertisements regarding homosexuality, court found fact question regarding state action because government entity had contracted with a private company to build and maintain bus shelters but had retained control over the content of advertisements selected for display); *Sims v. Jefferson Downs*, 611 F.2d 609 (5th Cir. 1980) (court found a fact issue regarding state action because the state licensing authority participated in a private track's allegedly discriminatory action against plaintiff).

> same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . .

42 U.S.C. § 1981(a).  The phrase "make and enforce contracts" is defined as including "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id*. § 1981(b).  Unlike a claim under Section 1983, a Section 1981 claim does not require state action.  In this case, the "contract" at issue is Plaintiff's ticket to the Match.

Plaintiffs bringing a Section 1981 claim may prove their case with circumstantial evidence under the *McDonnell-Douglas* framework.  *Arguello v. Conoco*, 330 F.3d 355 (5th Cir. 2003).  To establish a *prima facie* case, a plaintiff must establish three elements: (1) that she is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and, (3) that the discrimination concerned one of the activities enumerated in the statute, including making and enforcing contracts.  *Id*. at 358.  *See Dunaway v. Cowboys Nightlife, Inc.*, 436 F. App'x 386, 389-90 (5th Cir. 2011).  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. If the defendant does so, the burden shifts back to the plaintiff to show that the proffered non-discriminatory reason was actually a pretext for illegal discrimination.  *Dunaway*, 436 F. App'x at 390 (citing *Bright v. GB Bioscience, Inc.*,

305 F. App'x 197, 202-03 (5th Cir. 2008)).

Defendants argue in this case that Plaintiff has not demonstrated a genuine issue of material fact as to the second element, which is Defendants' intent to discriminate against Plaintiff "'on the basis of race'." *Arguello*, 330 F.3d at 348 (quoting *Morris v. Dillard Dep't Stores, Inc*., 277 F.3d 743, 751 (5th Cir. 2001)).[14] Based on the evidence in the summary judgment record, the Court agrees.

Even resolving all fact questions in favor of Plaintiff, Plaintiff has not presented evidence that Buchanan, or DSL, acted based on her race. Plaintiff testified that, when Buchanan spoke to her on the concourse, he asked her why she was carrying "that flag," and stated that "it [*i.e.*, the flag] implie[d] a racial slur." Plaintiff's Deposition (Exhibit O-153 to Motion), at 43. Goodspeed similarly testified that, after receiving a report regarding Plaintiff and observing Plaintiff through binoculars, she instructed Buchanan to respond, telling him that Plaintiff "had a Palestinian flag" and that "it [*i.e*., the flag] could be seen as a racial slur." Goodspeed Deposition (Exhibit M-152

---

[14]    Although Section 1981 protects only against discrimination on the basis of race, and not national origin, the term "race" is interpreted so broadly in the case law as to functionally include national origin discrimination. *Alvarado v. Shipley Donut Flour & Supply Co*., 526 F. Supp. 2d 746, 754 (S.D. Tex. 2007) (Section 1981 protects groups such as "Arabs," "the Scandinavian races," and "Mexicans"). For purposes of this motion, the Court will assume that discrimination because a person is Palestinian or Palestinian-American qualifies as discrimination on the basis of race under Section 1981.

to Motion) at 72.[15]

When questioned at deposition about the role her race played in the incident,

Plaintiff testified as follows:

> Q:     . . . . So it is your testimony that Nathan Buchanan came and told
>        you to come down to talk to him because you were Palestinian?
>
> A:     I don't know why Nathan told me to come and told me my flag is
>        racist.  I don't think Nathan knows what a Palestinian is, so I don't
>        know.

Plaintiff's Deposition (Exhibit P-153 to Motion), at 64-65.  Plaintiff then testified that

she was identifiable as Palestinian solely because of the flag:

> Q:     So is there some feature or mark or, for lack of another word,
>        color about you that denotes you as a Palestinian to the general
>        population?
>
> A:     It was the flag.
>
> Q:     It was the flag?
>
> A:     Yes.
>
> Q:     Nothing other than the flag?
>
> A.     No.  Because I look like I'm Italian or Greek or Latino.  So that's

---

[15]     Indeed, Plaintiff alleges in her briefing, when arguing that Section 1981's *prima facie*
elements are satisfied, that "Defendants . . . intended to treat Ms. Hammad differently
than other, similarly situated individuals, ***due to her support for Palestine***," rather
than due to her race.  Response, at 20 (emphasis added).  She further alleges that
Defendants "intentionally discriminated against Ms. Hammad on the basis of her
Palestinian ancestry by targeting and detaining her ***for waving a Palestinian flag***."
*Id*. (emphasis added).

> why when you asked about race or ethnicity, I don't know.  But
> the flag was clearly identifying me as a Palestinian-American, I
> mean, or Palestinian origin.

*Id*. at 64.[16]  However, as Plaintiff subsequently agreed, carrying a flag does not

necessarily correspond with the flag bearer's race.

> Q:     Well—but non[-]Palestinians could carry the Palestinian flag?
>
> A:     Absolutely, absolutely. . .
>
>             \*          \*          \*          \*
>
> Q:     So the mere fact that you are carrying the Palestinian flag does not
>        then mean that you are Palestinian.  Correct?
>
> A:     That's possible, yeah.  That's true.

*Id.* at 65-66.  Put simply, there is no evidence in the record that Defendants were

aware of, or acted on account of, Plaintiff's race rather than on the identity of her flag.

As further support for the undisputed evidence that Defendants acted based

solely on Plaintiff's flag, the Court notes that Buchanan permitted Plaintiff to return

to her seat with the flag once Plaintiff and Buchanan reached a compromise.  Indeed,

for the remainder of the Match, Plaintiff had no further incident with Stadium security,

---

[16]     *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 757-58 (7th Cir. 2006) (plaintiff
failed to demonstrate intent to discriminate on basis of race for purposes of Section
1981 claim because plaintiff testified that he had no external features that identified
his race and, at the time of the alleged discrimination, the defendant had no other
means of identifying his race).

and was permitted to possess and display her flag.

To the extent Plaintiff argues that Section 1981 protects her against discrimination prompted by one's expression of racial identity, the Court acknowledges that Plaintiff's support for Palestine is closely linked with her race, and her support for Palestine is an important means of expressing her identity. Nevertheless, Section 1981 requires proof that Defendants intended to discriminate against Plaintiff "on the basis of race." *See Arguello*, 330 F.3d at 348. Viewed in the light most favorable to Plaintiff, the record in this case shows only that Defendants took action against a Palestinian flag. This action, and Buchanan's statement that the Palestinian flag itself was a "racial slur," was inappropriate and regrettable, as Defendants now agree. *See* Hall Deposition (Exhibit E-148), at 103-04 (Hall reprimanded Buchanan for the incident); Buchanan Deposition (Exhibit H-149 to Motion), at 140-43 (Buchanan acknowledges his poor choice of words). However, the evidence in the record that Defendants prevented Plaintiff from expressing support for Palestine is not the legal equivalent of evidence that Defendants acted, with intent, based on Plaintiff's race, as required for Section 1981. Indeed, as Plaintiff acknowledged in her deposition, a non-Palestinian person could have been waving her flag that day. Plaintiff has cited no authority, and the Court is aware of none, suggesting that Defendants' actions concerning her Palestinian flag are prohibited race

discrimination under Section 1981.  Plaintiff's Section 1981 claim fails on the second *prima facie* element, intentional discrimination on the basis of her race.

Given this holding, the Court need not address Defendants' arguments on the third element of the *prima facie* showing, *i.e.*, whether Defendants' alleged discrimination affected Plaintiff's right to make, enforce, or enjoy the benefits of the parties' contract (in this case, her ticket to the Match).  The Court also need not address the issues of non-discriminatory reason and pretext.

Summary judgment is granted for Defendants on Plaintiff's Section 1981 claim.

## C.    Title II Public Accommodations Claim

Title II of the Civil Rights Act protects against discrimination in places of public accommodation:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

42 U.S.C. § 2000a(a).   A "stadium" or "sports arena" whose operation affects interstate commerce is a place of "public accommodation" under Title II.  42 U.S.C. § 2000a(b)(3).  A complainant whose rights under Title II are violated may bring a civil action for injunctive relief.  42 U.S.C. § 2000a-3(a).   *See Bass v. Parkwood Hosp.*, 180 F.3d 234, 244 (5th Cir. 1999) (Title II "allows only for prospective relief

and does not authorize damage awards").  Plaintiff seeks only injunctive relief for her

Title II claim.  Response, at 20 n.90.

A plaintiff seeking injunctive relief must show that she is likely to suffer future

harm.[17]  In order to satisfy the "case or controversy" requirement under Article III of

the Constitution, a plaintiff seeking injunctive relief "must show that [s]he has

sustained or is immediately in danger of sustaining some direct injury as the result of

the challenged conduct."  *Armstrong*, 141 F.3d at 563 (internal quotation marks and

alterations omitted) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

Moreover, as stated in *Armstrong*, "the injury or threat of injury must be both real and

immediate, not merely conjectural or hypothetical."  *Id*. at 563 n. 23 (quoting *Lyons*,

461 U.S. at 102) (internal quotation marks and alteration omitted).   "Past exposure

to illegal conduct does not in itself show a present case or controversy regarding

injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992)  (internal quotation marks,

citations, and alteration omitted).

Defendants argue that Plaintiff has failed to present evidence of future harm,

---

[17]     *See Bass*, 180 F.3d at 245 ("Bass does not have standing to assert a claim for
injunctive relief against the hospital because there is no allegation suggesting that he
is likely to again suffer from Parkwood's discriminatory actions.") (citing *Armstrong
v. Turner Indus.,* 141 F.3d 554, 563 (5th Cir. 1998)).

or any continuing present effects of Defendants' actions at the Match regarding her Palestinian flag.  Plaintiff was permitted to stay at the Stadium for the duration of the Match and, after her discussion with Buchanan on the concourse, she was permitted to keep her flag.  Plaintiff acknowledges that, although she walked to a concession stand at halftime with the flag draped over her shoulders and down her back, and left the Stadium the same way after the Match, she had no further incident with Stadium security during the Match.  She further testified that she attended a different soccer match on July 26, 2014, and displayed Palestinian flags, again without incident.

Nevertheless, Plaintiff argues that she has made a showing of future harm because Defendants may repeat their actions:

> It is reasonably likely that similar discrimination will recur because of the continuing, present adverse effects of Defendant's prohibition on the waving of Palestinian flags, and because Ms. Hammad plans to watch soccer at the Stadium with her Palestinian flag and other forms of free expression in the future.  Moreover, no evidence has been presented that [HCHSA] or Dynamo has changed its policies to guarantee the diverse expression of national pride.  If Defendants decided the simple waving of Ms. Hammad's flag was offensive, it certainly can do so again.[18]

_____

[18]    Response, at 17-18 & n. 78 (citing Second Declaration of Buthayna Hammad, dated Sept. 16, 2015  (Exhibit 5 to Response), at 3, ¶ 15 (stating that Plaintiff intends to attend future games with her flag and to express her political views, but does not want to have to attend in large groups or contact the stadium in advance, and that Defendants have "not changed [their] policies to permit the expression of diverse opinions and the waiving [sic] of all national flags"); First Amended Complaint [Doc. # 12], at 11 ¶ 49 (stating Plaintiff's intention to attend future games and desire to "show support of her people" during those games)).  The Court notes that Defendants
(continued...)

This argument is speculative and unpersuasive.  First, there is no evidence that Defendants have a "policy" that prevents expression of national pride, as Plaintiff's briefing implies, nor that they have instituted a "prohibition on the waving of Palestinian flags."  Rather, the evidence shows that, during the Match, Defendants observed and reacted to Plaintiff's particular situation, ending in a compromise by which she was permitted to keep her flag but not wave it.  This challenged conduct by Defendants was confined to the single Match.  There simply is no evidence of a blanket policy at the Stadium that prohibits waving Palestinian flags.

Thus, no competent summary judgment evidence supports Plaintiff's claim of future harm.[19]  The Court notes also that Plaintiff has not proposed specific injunctive

---

[18]    (...continued)
have objected to Plaintiff's declaration.  However, even if Defendants' objections were overruled, the declaration would be insufficient to defeat summary judgment for the reasons stated above in the accompanying text.  Furthermore, allegations in the pleadings are not competent summary judgment evidence. *See Diamond Offshore*, 302 F.3d at 545 n.13.

[19]    Plaintiff argues that Defendants' voluntary discontinuance of the challenged behavior does not prevent issuance of an injunction if there is a reasonable expectation that the behavior will repeat, citing *inter ali*a an unpublished Fourth Circuit case, *Feldman v. Pro Football, Inc*., 419 F. App'x 381 (4th Cir. 2011), and *Spector v. Norwegian Cruise Line Ltd*., 2007 WL 2900588 (S.D. Tex. Sept. 28, 2007) (Rainey, J.).  Response, at 17-18.  This cases, both of which were brought under the Americans with Disabilities Act ("ADA"), are not directly on point.  In *Feldman*, the defendants had partially modified their behavior after plaintiffs had filed suit, but the district court held that the case was not moot because a live dispute remained between the parties.  *Feldman*, 419 F. App'x at 387-88.  In *Spector*, the court found standing based on the threat of future harm because the plaintiffs had "established ***ongoing*** policies
(continued...)

relief.[20]   To the extent Plaintiff seeks to have a court order directing a "policy" revision, the only potential questioned policies in the record are the Lease and the Stadium guidelines, none of which restricts flags of Palestinians or any other specific nationalities.   It thus is unclear what policy revisions could be devised to address Plaintiff's concerns.  Similarly, it would make little sense to order Defendants to allow Palestinian flags at future events, given that Defendants allowed Plaintiff's flags at the July match and no evidence suggests that they would not do so in the future.

Summary judgment is granted for Defendants on Plaintiff's Title II claim.

### D.   <u>False Imprisonment Claim</u>

Plaintiff brings a claim for false imprisonment under Texas law.  The elements of false imprisonment are (1) willful detention (2) without consent and (3) without authority of law.  *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644-45 (Tex. 1995) (citing *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex.

---

[19]      (...continued)
and practices by [the defendant] which may violate the ADA" and there was "a real threat that if Plaintiffs were to take another . . . cruise [offered by the defendant] the same conditions would exist."   *Spector*, 2007 WL 2900588, at *5 (emphasis added). In this case, Plaintiff has not presented competent summary judgment evidence of an ongoing live dispute between the parties.

[20]      Injunctive relief would be awarded by the Court, not a jury.  *See Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 193 (5th Cir. 2008) ("unless Congress has expressly provided to the contrary, an injunction is an equitable remedy that does not invoke a constitutional right to a jury trial").

1985)).  A detention "may be accomplished by violence, by threats, or by any other means that restrains a person from moving from one place to another." *Randall's*, 891 S.W.2d at 645.  There is no state action requirement for a false imprisonment claim.

Plaintiff has failed to demonstrate a genuine issue of material fact on the first element, *i.e.*, "willful detention."  As a preliminary matter, the facts recounted above, resolving all discrepancies in Plaintiff's favor, demonstrate that the incident lasted no more than twenty minutes.   Plaintiff's Deposition (Exhibit P-153 to Motion), at 50. Although the case law does not specify a minimum time period that can establish "willful detention," the cases cited by Plaintiff involved much longer incidents.[21]

Moreover, as for any threats or other means of restraint that were used to accomplish the alleged detention, *see Randall's*, 891 S.W.2d at 645, Plaintiff relies on her allegations that "Buchanan physically blocked [her] way as she tried to leave [his presence], told her she could not leave the conversation, stated that he could prevent her from returning to her seat, and did so for at least twenty minutes." Response, at 22.  At her deposition, Plaintiff testified that Buchanan allowed Morales

---

[21]    In *Randalls*, the plaintiff had been confined to a back office "for several hours" on suspicion of theft. *Randalls*, 891 S.W.2d at 645.  In *Oramulu v. Wash. Mut. Bank*, 699 F. Supp. 2d 898, 910-12 (S.D. Tex. 2009) (Ellison, J.), the plaintiff's false imprisonment claim was based on an alleged "detention" at a bank that lasted eight hours.  *See Martinez v. Goodyear Tire & Rubber Co*., 651 S.W.2d 18, 21 (Tex. App.–San Antonio, 1983) (considering whether detention for investigation of suspected theft was done "in a reasonable manner and for a reasonable period of time").

to return to his seat, but prevented Plaintiff from following:

> [Buchanan] moves aside so Jonathan [Morales] can walk past.  And I start to follow, and he ***obstructs my way physically***, ***puts his hands out*** and says, He can go, but you can't. . . . . He said I couldn't go back until I gave him that flag.

Plaintiff's Deposition (Exhibit O-153 to Motion), at 44-45 (emphasis added).[22]  In other words, viewing all evidence in a light most favorable to Plaintiff, she provides no evidence of any threat against her.  As for physical restraint, she alleges only that Buchanan physically obstructed her path to the seat and "put his hands out."  Even if proven, however, this allegation would be insufficient to establish a "willful detention" under Texas law, especially given that Buchanan permitted her to return to her seat once the parties reached a compromise.  In *Randall's*, which involved an employer's suspicion of theft by an employee, the Supreme Court of Texas rejected the employee's false imprisonment claim on similar grounds, concluding as a matter of law that the store director's request that the employee "not work in one area of the workplace" while awaiting the district manager's arrival did not constitute "willful detention" when there was no allegation of physical force or threat to the employee's

---

[22]     *See* Morales Deposition (Exhibit S-154 to Motion), at 45 (Morales testified that Buchanan permitted Morales to return to his seat, but stated that Plaintiff could not return to her seat with the flag).

person, reputation, or property.  *Id*. at 645 & n.4 (citing cases).[23]  Moreover, although Plaintiff states that other police officers and other security personnel were present on the concourse, she does not point to any conduct that amounts to actionable restraint or threat from them.[24]

Finally, by Plaintiff's own account, Buchanan did not restrain her from leaving the concourse, as would be customary for "detention."  Plaintiff testified that he prevented her from returning to her seat *with her Palestinian flag*.  Plaintiff cites to no authority suggesting that a false imprisonment claim can be successfully

---

[23]   *See also Hernandez v. Lasko Products, Inc*., 2012 WL 4757898, at *8 (N.D. Tex. Oct. 5, 2012) (Lynn, J.) (rejecting a false imprisonment claim when plaintiff offered no evidence of a threat of restraint, and stating that Texas cases did not support the proposition "that merely being told one cannot leave, absent a threat of some kind, establishes an issue of fact as to willful detention").  In contrast, the *Oramulu* court denied summary judgment to defendant on the plaintiff's false imprisonment claim, noting that although the plaintiff had not been handcuffed or touched, the plaintiff had alleged that he had been held for eight hours, that he was not permitted to leave the bank, that the defendant accused him of theft and threatened him with prison, and that the police had been called. *Oramulu*, 699 F. Supp. 2d at 912.

[24]   Plaintiff contends in her briefing that Buchanan "surrounded her with security personnel" after removing her from her seat.  Response, at 22 (citing generally to Plaintiff's Declaration (Exhibit 4 to Response)).  In her deposition, Plaintiff testified that, when she and Buchanan reached the concourse, they were met by two uniformed police officers and an additional Stadium employee.  Plaintiff's Deposition (Exhibit O-153 to Motion), at 34.  She further testified that two additional officers arrived during her conversation with Buchanan.  *Id*. at 36-37.  However, she also testified at deposition that the officers and the additional Stadium personnel did not speak with her or with Morales, and that they did not speak with Buchanan in her presence. *Id*. at 35-36.  Although Plaintiff's briefing and testimony imply that she felt intimidated by the presence of security personnel, she does not attest to any actionable threat or restraint.

maintained when, as here, the plaintiff could have ended the alleged "detention" by temporarily surrendering a piece of property.  Moreover, after discussion with Plaintiff, Buchanan in fact permitted Plaintiff to return to her seat with the flag.

Plaintiff has failed to demonstrate a genuine issue of material fact that she was willfully detained by threats or other means. *See Randall's*, 891 S.W.2d at 644-45. Summary judgment is granted in favor of Defendants on Plaintiff's false imprisonment claim.

## E.  **Spoliation Motion**

Plaintiff has filed a "Motion for Spoliation Holding and Request for Negative Inference Instruction" [Doc. # 57] ("Spoliation Motion"), to which Defendants have responded [Doc. # 62].  Plaintiff complains that Defendants failed to preserve "full game video footage of the Stadium seating area," Spoliation Motion, at 10, which she states is relevant to all of her claims for discrimination and disparate treatment.  In particular, Plaintiff states that the destroyed video evidence would demonstrate that Defendants allowed others to wave their flags at the Match, and thus that Plaintiff received different treatment.  She requests that the Court draw a negative inference, and instruct the jury to do the same, regarding the destroyed video evidence.

Spoliation is "the destruction or the significant and meaningful alteration of evidence." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612

(S.D. Tex. 2010) (Rosenthal, J.).  A party seeking the sanction of an adverse inference

instruction based on spoliation of evidence must establish the following:

> (1) the party with control over the evidence had an obligation to preserve
> it at the time it was destroyed;  (2) the evidence was destroyed with a
> culpable state of mind; and (3) the destroyed evidence was "relevant" to
> the party's claim or defense such that a reasonable trier of fact could find
> that it would support that claim or defense.

*Id.* at 615-16 (citing *Zubulake v. UBS Warburg LLC* (*Zubulake IV* ), 220 F.R.D. 212,

220 (S.D.N.Y. 2003)).[25]  "Courts recognize that a showing that the lost information

is relevant and prejudicial is an important check on spoliation allegations and

sanctions motions."  *Id.* at 616.

Plaintiff complains that although Defendants produced twenty minutes of video

evidence from four cameras in the Stadium's seating area, they should have produced

"video evidence from the entire game."  Spoliation Motion, at 3.   The parties agree

that the Stadium video footage is automatically overwritten, and thus destroyed, after

approximately 108 days.  In this case, Plaintiff served Defendants with the lawsuit 66

days after the Match.  Buchanan, before being named as a Defendant,  reviewed

---

[25]     The amended discovery sanctions rule that will take effect on December 1, 2015,
allows a negative inference instruction only upon a finding of intent. FED. R. CIV. P.
37(e) (eff. Dec. 1, 2015).  Under the new rule, a district court may sanction a party's
failure to take "reasonable steps" to preserve electronically stored information "that
should have been preserved in the anticipation or conduct of litigation."  *Id.*  The
court may presume that the lost information was unfavorable to the offending party,
or may instruct the jury to do so, "***only*** upon finding that the party acted with the
intent to deprive another party of the information's use in the litigation."  *Id.*

footage from the Match and Defendants made a production to Plaintiff of video evidence.  However, Plaintiff claims that she was not aware of additional video evidence until Buchanan's deposition on June 1, 2015, after the 108-day period. Thereafter, on June 9, 2015, Plaintiff served Defendants with a discovery request for all security video, to which Defendants objected.  In August 2015, Defendants informed Plaintiff that the remaining video evidence had been destroyed.  Plaintiff now complains that Defendants "unilaterally determined that the only relevant video evidence from the seating area of the Stadium were portions recorded immediately before and during the time of [Plaintiff's] detention."  *Id*.

Plaintiff has not met her burden to show that Defendants had a duty to produce "video evidence from the entire game" before it was destroyed, nor that Defendants acted in bad faith.  Plaintiff does not claim to have requested the video evidence any time before June 9, 2015, after the 108-day automatic overwrite of the evidence. Moreover, prior to June 2015, without a discovery request from Plaintiff, Defendants reviewed the video evidence of the Match and preserved the footage that was relevant and later was produced to Plaintiff.

In addition, Plaintiff has not shown prejudice because the evidence sought by Plaintiff, even if it had been preserved, would not have been dispositive of any claim before the Court.  Even if Plaintiff were granted a negative inference instruction

regarding disparate treatment—the sanction she requests—the Court's conclusions in this Memorandum would not change.  Plaintiff's Section 1983 claims would fail because the state action requirement would be unmet.  The Section 1981 claim would fail because there still would be no probative evidence of *racial* animus, rather than Defendants' intent focused on the identity of her flag.   Regarding the Title II claim, Defendants still would prevail based on the lack of evidence of future harm.  Finally, on Plaintiff's claim of false imprisonment, Defendants' conduct towards other Match patrons is irrelevant.

Plaintiff's spoliation motion and her request for attorneys' fees related to the motion are denied.

IV.    **CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED**  that Defendants' Motion for Summary Judgment [Doc. # 44] is **GRANTED**.  All of Plaintiff's claims are **DISMISSED with prejudice**.  It is further

**ORDERED**  that Defendants' Motion to Strike [Doc. # 64] is **DENIED**.  It is further

**ORDERED**  that Plaintiff's Motion to Strike [Doc. # 68] is **DENIED**.  It is further

**ORDERED**  that Plaintiff's Motion for Spoliation Holding and Request for

Negative Inference Instruction [Doc. # 57] is **denied**.

A separate final judgment will issue.

SIGNED at Houston, Texas, this 10th day of **November, 2015**.

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE